**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| GARTNER, INC., a Delaware corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. _____ |
| | ) |
| INFO-TECH RESEARCH GROUP, INC., a | ) |
| Delaware corporation, and ALIA MENDONSA, | ) |
| an individual, | ) |
| | ) |
| Defendants. | ) May 17, 2023 |
| | ) |
| | ) |

**VERIFIED COMPLAINT**

Plaintiff Gartner, Inc. ("Gartner") for its Complaint against Defendants Info-Tech Research Group, Inc. ("Info-Tech") and Alia Mendonsa ("Mendonsa") (collectively, "Defendants") states as follows:

**INTRODUCTION**

1.      Info-Tech has unfairly and deceptively targeted a long-tenured and highly regarded Gartner analyst, Alia Mendonsa, to exploit Gartner's client relationships and poach Gartner's customers in the highly specialized IT research and advisory industry.

2.      As part of its anti-competitive scheme, Info-Tech hired Mendonsa – in direct contravention of her post-employment obligations to Gartner – to undermine Gartner's premier industry rank and tap into Gartner's specialized and niche research and advisory offerings.

3.      Info-Tech is not discreet about its mission to steal Gartner's market share – at any cost.  Only weeks into her Info-Tech tenure, Mendonsa assisted Info-Tech in its unlawful attempt to steal one of Gartner's longstanding clients with whom Mendonsa had previously worked as a

Gartner analyst.  During that client call, Mendonsa helped showcase Info-Tech's products and services – which are directly competitive with those Gartner already provides to the client.

4.    Solely by virtue of her Gartner employment, Mendonsa has a keen knowledge and understanding of this client's mission-critical priorities, preferences, and needs – as well as the products and services they have purchased from Gartner – information which she will inevitably use at Info-Tech to unlawfully poach Gartner's client.

5.    Mendonsa's efforts to sway this client to move its business to Info-Tech, one of Gartner's primary competitors, not only violated her post-employment obligations to Gartner, it confused Gartner's client given the prior work the client had done with Mendonsa during her lengthy career at Gartner.

6.    Gartner has no affiliation or association with Info-Tech.  Info-Tech's efforts to capitalize on Mendonsa's intimate knowledge of Gartner's clients, their buying preferences, and their business priorities/needs are misleading, deceptive, and confusing.

7.    In furtherance of its deceptive scheme, Info-Tech – whose Chief Executive Officer and Chief Revenue Officer, among others, are former Gartner employees – is targeting Gartner employees to build its workforce.  Info-Tech is unfairly benefitting from the unique and specialized training and access to confidential and proprietary information Gartner provides its employees.

8.    More specifically, Mendonsa joined Info-Tech in a role substantively similar to and directly competitive with her former role at Gartner and in direct violation of her valid and enforceable protective covenant agreements with Gartner.  At Info-Tech, Mendonsa will undoubtedly be utilized in the same manner in which she served Gartner, including, among other things, creating and drafting research content, providing expert, advisory, and other support services to clients, and speaking at meetings, conferences, and events.  Given the competitive

nature of the two companies and Mendonsa's substantively similar role at Info-Tech, she will necessarily rely upon and utilize the confidential information and specialized training she acquired while employed by Gartner, all to Info-Tech's benefit.

9.      As part of its anti-competitive scheme, Info-Tech induced Mendonsa to breach her post-employment commitments to Gartner by hiring her in violation of her non-competition (including client non-solicitation) obligations.  Through this conduct, Info-Tech continues its attempts to unfairly compete with Gartner in a competitive and specialized marketplace, to Gartner's significant detriment.  Defendants' unlawful actions must be enjoined before they can cause further harm to Gartner's legitimate business interests, including its trade secrets, proprietary and confidential information, and client and employee relationships.

## PARTIES

10.      Gartner, Inc. is a Delaware corporation with its principal place of business located at 56 Top Gallant Road, Stamford, Connecticut 06902. The majority of Gartner's leadership, including its Operating Committee and Chief Executive Officer, are located in Connecticut.

11.      Info-Tech is a Delaware corporation. Info-Tech lists its Registered Agent as located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

12.      Alia Mendonsa is a former Gartner employee and resident of Phoenix, Arizona. During her Gartner tenure, Mendonsa worked and interfaced with Connecticut-based employees, including a fellow research analyst on her team.

## JURISDICTION AND VENUE

13.      Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1367 because Gartner asserts claims under the Federal Defend Trade Secrets Act. 18 U.S.C. § 1836, *et*

seq. and the Lanham Act for False Association and Unfair Competition, 15 U.S.C.S. § 1125, , *et seq*.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because, pursuant to Mendonsa's employment agreement with Gartner, Gartner and Mendonsa consented to the exclusive jurisdiction of the federal and state courts of Connecticut in the event of a breach or threatened breach of such agreement, and because Info-Tech has tortiously interfered with a contract governed by Connecticut law, and the effects of which can be felt in Connecticut.

## GENERAL ALLEGATIONS

### Gartner's Business

15.     Gartner is a global research and advisory firm that provides clients with indispensable and enterprise-wide insights, advice and tools to help them achieve their mission critical priorities. Gartner delivers actionable, objective insight to executives and their teams. Gartner's expert guidance and tools enable faster, smarter decisions and stronger performance on an organization's mission critical priorities.

16.     Gartner delivers its products and services globally through several distinct business segments.  Gartner's Research and Advisory business delivers independent, objective research, advice, and guidance to leaders across an enterprise through subscription services that include on-demand access to published research content.

17.     Among other things, Gartner publishes Magic Quadrants ("MQ"), a series of market research reports based on its proprietary qualitative data analysis, which demonstrate market trends for a variety of technology-based industries.  A significant amount of the data analyzed in the MQs is gathered through Gartner's vendor briefings, where Gartner's analysts and advisors speak with various industry vendors in connection with preparing the MQs.  The vendor

briefings allow vendors an opportunity to educate Gartner about their businesses, including their place within the industry and their vision for the future of their companies.

18.     Within the Research and Advisory segment, there are myriad industry groups that specialize in distinct industries or market segments.  These groups create must-have research, market predictions, and best practices for C-level executives and their teams who operate within those industries and market segments.

19.     Mendonsa was part of Gartner's Government Research Group. This group focuses upon government-wide topics, applicable to any government, in any sector or tier, and in any region.

20.     Gartner distinguishes itself from its competitors based on, among other things, its talented employees and delivery of high-quality products and services which it has developed through significant time and expense.

**<u>Mendonsa's Employment with Gartner</u>**

21.     Mendonsa commenced her employment with Gartner in 2007.  She was an Executive Partner/Advisor in Gartner's Products and Services business until July 2016.  Mendonsa then moved over to Gartner's Research and Advisory business, taking the role of Senior Director, Analyst in the Government Research Group.

22.     In this role, Mendonsa served as a contributor and thought leader within Gartner's Research and Advisory organization, providing expert guidance and assistance to government leaders to enable faster, smarter decisions and stronger performance on a client organization's most critical priorities.

23.     Mendonsa served Gartner vendors in three distinct segments: Grants Management, Community Development and Regulations, and Enterprise Resource Planning ("ERP") Solutions

for Government. Mendonsa gained expertise in these segments by: utilizing Gartner's Secondary Research Services to identify vendors in each market; arranging and attending vendor briefings with selected vendors in each market; gathering knowledge from her direct peers, including her colleagues in Gartner Consulting who know these markets.   Mendonsa also developed, contextualized and delivered insightful and actionable research content for Gartner clients in each of these areas including, most recently, a *Market Guide for Government ERP Solutions.* This publication described the structure and dynamics of the ERP marketplace to assist clients with procuring ERP solutions, as well as criteria to apply and consider when selecting a solution. This publication yielded numerous inquiries from Gartner clients and vendors directly to Mendonsa, increasing her public-facing visibility. Mendonsa also played an instrumental role in developing and authoring Market Guides on: (i) Community Development, Regulation and Licensing Applications; and (ii) State and Local Grant Management Solutions.

24.     In addition, as a Gartner analyst, Mendonsa regularly advised Gartner clients via briefings and conferences on a variety of niche topics, including digital and IT strategy, ERP, sector-specific IT solutions, and emerging technologies.  On a more granular level, Mendonsa produced highly-visible and valuable research on COVID-spending by Governments, which was recognized as differentiated and sought-after by Gartner clients. Gartner Sales leadership recognized this body of work as a powerful aid in helping secure new business and retain existing revenue. This COVID-related work made Mendonsa an even more in-demand Gartner analyst, enabling her to forge deep and impactful relationships with Gartner clients during their most turbulent and vulnerable times.  These bonds continued to flourish after the pandemic, with high demand for Mendonsa's partnership enduring throughout her last day at Gartner.

25.    Gartner also afforded Mendonsa with crucial access to Gartner's research methods, tools and insights, business strategies, and analyses in these specific realms, in addition to Gartner's broader research processes, methodologies, analyses and strategies.

26.    Mendonsa acquired her Gartner acumen, in large part, from Gartner's end user clients.  These clients share their experiences with particular vendors and seek advice from Gartner analysts, like Mendonsa, about the selection or implementation of specific technology applications or the future of a particular markets or technologies. Mendonsa synthesized the clients' input, opined on the available options, and ultimately advised Gartner clients on how to solve these and other significant challenges.

27.    Mendonsa gained intimate knowledge of Gartner's clients by conducting research via client, vendor and analyst networking as well as evaluating and analyzing information and participating in research meetings and other activities.

28.    This knowledge, coupled with regular client interfacing, enabled Mendonsa to provide customized and specialized insight, advice, and guidance for Gartner clients.

29.    Solely by virtue of her Gartner employment, Mendonsa became a regular and well-known commentator to various media outlets about technology trends of interest to government executives.  This made Mendonsa one of the public faces of Gartner and its capabilities.

30.    To fulfill this role, Gartner trained and provided Mendonsa with highly confidential and strategic information concerning research methodologies, playbooks, and strategic opportunities. More specifically, Mendonsa's role focused on developing a deep understanding of the markets in which she specialized, the businesses operating in those markets, the priorities and needs of those businesses, and how to establish the kind of meaningful and trusting relationships

that enable these clients to make the best possible decisions on the toughest challenges they have to confront.

31.    Mendonsa expressly acknowledged the confidential and proprietary nature of the information to which Gartner provided her access throughout her employment in her Agreement Regarding Certain Conditions of Employment, as set forth herein.

32.    As a result, Mendonsa has intimate knowledge of Gartner's research methodologies, playbooks, and the strategies Gartner employs to monetize and expand its research offerings, among other things.  Through her Gartner employment, Mendonsa also learned how to advance Gartner research content; educate clients on advances, changes, and new trends or issues in a particular market; tailor Gartner's offerings to fit its clients' specialized needs and priorities; and speak to market issues, trends, and developments in areas where Gartner has research or other analysts available to guide and assist. This information is highly valuable to a competitor, like Info-Tech, who is looking to surpass Gartner and unlawfully steal its market share in this space.

33.    To prepare Mendonsa for her role, Gartner required Mendonsa to attend and successfully complete "Getting to Know Gartner," a training which includes in-depth programming on Gartner brand messaging, which is critical to Gartner's organizational success.

34.    Gartner also required Mendonsa to learn and study Gartner sales and research strategy, methodology, techniques, best practices, technologies, and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities and resources to a given client's needs.

35.    By virtue of her Gartner employment, Mendonsa also received access and exposure to a variety of Gartner's other confidential and trade secret information, including its product and service offerings (past, present and future); client and prospect identities; client entitlements; its

suite of different products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions.

36.    For this reason, Gartner required Mendonsa to attend and successfully complete Gartner's Data Protection Training.  This training outlines Gartner employees' data protection responsibilities and underscores the importance of protecting and safeguarding Gartner's confidential information.

37.    Gartner also protected the confidential and proprietary information and trade secrets to which Mendonsa had access by limiting such access and utilizing password-protected systems.

**The Agreement Regarding Certain Conditions of Employment**

38.    Because Gartner highly values its products, services, strategies, processes, tools, and insights, and because Gartner provided Mendonsa with access to such information,  Mendonsa entered into an Agreement Regarding Certain Conditions of Employment (the "Agreement") to protect Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.

39.    On January 22, 2007, in connection with the start of her employment, Mendonsa agreed to and accepted the Agreement.  *See* the Agreement attached hereto as **Exhibit A.**

40.    The Agreement contains, among other things, reasonable and limited post-employment confidentiality and non-disclosure, non-competition and non-solicitation provisions.

41.    The confidentiality and non-disclosure provisions of the Agreement prohibit Mendonsa from using or disclosing Gartner's or its clients' Confidential Information (as defined below).

42.     More specifically, the Agreement forbids Mendonsa from using or disclosing Gartner's or its clients' Confidential Information other than solely in the furtherance of Gartner's business and further prohibits Mendonsa from taking any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information. *See* Agreement, Section (1)(b)(i)(iv).

43.     The Agreement defines "Confidential Information" in Section 1(a) as:

> (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (viii) forecasts, (ix) computer programs, (x) data bases (and the documentation and information contained therein), (xi) computer access codes and similar information, (xii) software ideas, (xiii) know-how, technologies, concepts and designs, (xiv) research projects and all information connected with research and development efforts, (xv) records, (xvi) business relationships, methods and recommendations, (xvii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xviii) subscription or consultant termination dates, (xix) personnel files, (xx) competitive analyses, and (xxi) other confidential or proprietary information that has not been made available to the general public by the Employer's senior management. The Employee further acknowledges that all information related to the operation of the Employer's business, including, without limitation, knowledge of the Employer's assets referenced above and other tangible or intangible assets and other information obtained by the Employee in the course of employment (collectively, the "Employer's Property") (i) are confidential and trade secrets of the Employer (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Employer, and (iii) may be subject to trademark, tradedress, copyright or similar protections. The Employee acknowledges that any disclosure of the Confidential Information, even inadvertent disclosure, would cause irreparable and material damage to the Employer.

44.     The Agreement's non-competition provision provides, in pertinent part:

**5.    Non-Competition.**

…

(b) Non-Competition.

(i) Analyst or Consultant Position. The Employee agrees that, for a period of one year following the termination of the employment for any reason, the

Employee will not engage in any Competitive Acts: (A) with any client of the Employer with whom the Employer has a business relationship and with whom the Employee maintained contact at any time during the Employment; (B) with any product or service vendor with whom the Employer has a business relationship and with whom the Employee maintained contact at any time during the Employment; (C) with any entity or individual to whom the Employee submitted proposals for specific services on behalf of the Employer within one year prior to the termination of Employment; or (D) within the Non-Compete Area.

45.    The Agreement defines "Competitive Acts" and "Non-Compete Area" in Section 5(a)(i) as follows:

(i) Competitive Acts shall mean the development, marketing or selling of - or assisting others to develop, market or sell - a product or service which is competitive with the products or services of the Employer (both those existing during the Employment and those which are planned for the future and of which the Employee learns during the Employment), and the solicitation, directly or indirectly, of the Employer's clients or known prospects for the purposes of developing, marketing or selling such products or services, by the Employee (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise).

(ii) Non-Compete Area shall mean any location within a fifty (50) mile radius of the principal office in which the Employee worked at any time during the one year period prior to the termination of the Employment. If the Employee's principal office was in Stamford, Connecticut at any time during the one year period prior to the termination of the Employment, then the Non-Compete Area shall be defined as any location within (A) a fifty (50) mile radius of Stamford, Connecticut, and (B) the states of Connecticut, New York and Massachusetts.

46.    The Agreement's employee non-solicitation provision provides, in pertinent part:

(d) Non-Recruitment. During the Employment and for three (3) years following the termination of Employment for any reason, the Employee agrees not to hire, recruit or encourage any person who is then an employee of the Employer to leave the employ of the Employer, whether on the Employee's own behalf or on behalf of any other person or entity.

*See* Agreement, ¶5(d).

47.    By signing the Agreement, Mendonsa agreed, among other things, that all information related to the operation of Gartner's business, including, without limitation,

knowledge of Gartner's assets and other information she obtained in the course of her employment, are confidential and trade secrets of Gartner and shall remain the property and trade secrets of Gartner. Mendonsa further acknowledged any disclosure of Gartner's Confidential Information, even inadvertent disclosure, would cause irreparable and material damage to Gartner. *See* Agreement, ¶ 1(a).

48.     Mendonsa further agreed to the Agreement's forum selection clause, thereby "consent[ing] in advance to the jurisdiction of the appropriate state or federal courts located within the state of Connecticut" and acknowledging the Agreement "shall be governed by and construed in accordance with the laws of the state of Connecticut without regard to its conflict of laws principles." *See* Agreement, ¶ 11. By executing the Agreement, Mendonsa further acknowledged she "ha[d] been given the opportunity to consult with legal counsel for the purposes of reviewing this Agreement, and . . . underst[ood] the meaning and legal effect of this Agreement." *Id.*, ¶ 10.

49.     Mendonsa also agreed if she violated the Agreement's terms, Gartner would be entitled to, among other things, immediate injunctive relief. *See* Agreement, ¶ 7(a).  Mendonsa further agreed to the Agreement's tolling provision, providing "the limitation periods for the restrictions contained herein shall be tolled for the length of time during any period in which any of the restrictions are violated." *See* Agreement, ¶ 5(e).

**Gartner Protects Its Confidential Information**

50.     Gartner protected the confidential and proprietary information and trade secrets to which Mendonsa had access by, among other things, requiring her to attend trainings and to affirm her compliance with Gartner's Code of Conduct and other core policies, like Gartner's Data

Protection Policy.  In reliance on  Mendonsa's affirmations, Gartner provided Mendonsa access to highly sensitive content that is unavailable to other Gartner employees.

51.     Additionally, Gartner requires employees with access to its confidential and proprietary information and its trade secrets to execute agreements substantially similar to the Agreement.

**Info-Tech's Business and Targeting of Gartner in the Technological Research Marketplace**

52.     Similar to Gartner, Info-Tech provides a wide array of research and advisory services to its clients, in particular CIOs and other IT leaders, that are designed to enable strategic, timely and well-informed decisions.

53.     Like Gartner, Info-Tech relies on industry-specific analysts to guide and assist their clients through myriad technology-related decisions through offerings like:

    a.   Product reviews;

    b.   B2B marketing and sales solutions;

    c.   Event management;

    d.   Research data;

    e.   Expert guidance and advice;

    f.   Consulting;

    g.   Advance technology; and

    h.   Training and education.

54.     Info-Tech is incorporated in the State of Delaware and conducts business throughout the United States.

55.    Info-Tech touts itself as an industry leader in "produc[ing] unbiased and highly relevant research to help CIOs and IT leaders make strategic, timely, and well-informed decisions."[1]

56.    Info-Tech's website explains its "data-driven programs enable IT leaders to objectively measure success, develop an impactful IT strategy, and systematically improve performance year over year."[2]

57.    Gartner, too, markets itself as "deliver[ing] actionable, objective insight to executives and their teams" and providing "[t]ools to make smarter, faster decisions."[3]

58.    On a more particularized level, Info-Tech directly competes with Gartner to win business from public sector clients, the precise type of clients with whom Mendonsa was able to build strong relationships by virtue of her Gartner employment.  As of May 2022, Info-Tech publicized twelve (12) open roles supporting its public sector sales team, in clear hopes of growing their presence in this market. In April 2023, Info-Tech announced the opening of an office in Arlington, Virginia – where Gartner operates a large office – because Arlington is "[s]trategically located in close proximity to key government facilities such as the Pentagon, Capitol Hill, and the Ronald Reagan National Airport."[4]  In May 2023, Info-Tech presented to the Department of Economic Opportunity in an effort to further advance their public sector business.

59.    Also like Gartner, Info-Tech regularly publishes research to inform the decisions of consumers in the technological research sector – and ultimately seeks to earn those clients' consumer spend.  For instance, a May 1, 2023 industry publication explains, "[t]o support IT and

---

[1] *See* https://www.infotech.com (accessed May 5, 2023), attached as **Exhibit B** hereto.
[2] *Id.*
[3] *See* https://www.gartner.com (accessed May 5, 2023). *See* **Exhibit B**.
[4] *See* https://www.prnewswire.com/news-releases/info-tech-research-group-expands-us-operations-with-new-office-in-arlington-virginia-301797746.html?utm_source=LinkedIn&utm_medium=Social+&utm_campaign=Brand (accessed May 16, 2023), attached hereto as **Exhibit C.**

organizational leaders in this endeavor, Info-Tech Research Group has assembled use cases to help guide selection and ensure strong points of integration between eCommerce and other software, such as customer relationship management (CRM) and point of sale (POS)." This research mirrors Mendonsa's own Gartner research initiatives, further revealing the companies' – and Mendonsa's respective roles' – significant overlap.[5]

60.     In light of the companies' parallel and directly competitive offerings, Info-Tech has targeted Gartner employees, like Mendonsa, to join Info-Tech in order to unfairly capitalize on the specialized training and unique knowledge Gartner provides its employees to directly compete with Gartner.

61.     To further target Gartner's clients and usurp its market share, Info-Tech is creating a false association or affiliation with Gartner to increase its own profile and legitimacy in the industry.  This is deceptive and misleading to the public, the Gartner brand, and Gartner's current and prospective clients.

62.     For instance, on April 27, 2023, Info-Tech had a sales call with one of Gartner's longstanding public sector clients. Mendonsa attended this call on Info-Tech's behalf, specifically to help bolster and showcase Info-Tech's offerings which are directly competitive with those of Gartner.  Through her Gartner employment, Mendonsa has intimate knowledge of the client's mission-critical priorities, preferences, and needs – as well as the products and services they have purchased from Gartner – which is presumably why Info-Tech included her on the call.

63.     The client subsequently informed Gartner about the meeting and explained it was confused when Mendonsa joined the call on behalf of Info-Tech, one of Gartner's primary

---

[5]*See* https://www.prnewswire.com/news-releases/selecting-the-right-ecommerce-platform-is-critical-in-a-competitive-market-says-info-tech-research-group-in-new-industry-guide-301812023.html (accessed May 9, 2023), attached as **Exhibit D** hereto.

competitors. The client further informed Gartner it did not understand why Mendonsa was pitching and advertising Info-Tech products, particularly given her longstanding Gartner tenure.

64.     Mendonsa's and Info-Tech's actions deliberately and necessarily created brand confusion between Info-Tech and Gartner, and publicized a false connection to and/or affiliation with Gartner.

65.     Gartner has no affiliation with or connection to Info-Tech.

66.     Info-Tech's competition with Gartner dates back to 2012. Since then, Info-Tech has consistently marketed itself as a competitor to Gartner.  Info-Tech's website makes various, specific references to Gartner in an attempt to undercut its offerings and tarnish its reputation. For instance, Info-Tech chided Gartner for its alleged "misleading titles" and also advertised "Outsell recently ranked Info-Tech Research Group ahead of Gartner."[6] Such misrepresentations directly impact Gartner and its ongoing and prospective client relationships.

67.     Info-Tech's own website pinpoints Gartner's "influential Magic Quadrants"[7] – one of Gartner's most distinctive features.  To that end, Info-Tech also uses largely the same fonts and colors as Gartner to create further brand confusion and to deceive the market as to an affiliation, connection, or association between Gartner and Info-Tech.

68.     Info-Tech also targets Gartner in its promotional materials. This includes side-by-side comparisons of the companies' parallel offerings, misrepresenting in relevant part that "Gartner's library of notes requires you to connect the dots. Info-Tech's actions lead you to results." Info-Tech's materials further malign Gartner's offerings in a number of other ways,

---

[6] *See* https://www.infotech.com/research/it-the-great-place-to-work-institute-recognizes-info-tech-research-group-as-one-of-canadas-2012-best-workplaces;  https://www.infotech.com/research/it-device-confusion (accessed May 5, 2023); attached as **Exhibit E** hereto.
[7]   *See*   https://www.infotech.com/research/slack-expands-data-residency-6-ecms-that-users-like-and-more-news-of-the-week (accessed May 5, 2023), attached as **Exhibit F** hereto.

including the accusation that Gartner provides "Opinion Pieces that won't always agree" and "insight but not a guide to action." Info-Tech has also marred Gartner in this and other marketing materials as an "Unconnected Library of Notes," and offering "limited actionable advice," among other incorrect -- and indeed shameless -- descriptors.

69.     Info-Tech is capitalizing upon Gartner's premier industry rank – specifically by poaching Gartner's long-tenured employees, like Mendonsa –  to increase its visibility in the industry.  Info-Tech is exploiting Gartner's valuable client relationships – developed at Gartner's considerable time and expense –  to strengthen its own credibility in the marketplace, all to Gartner's detriment.

**Mendonsa's Employment with Info-Tech**

70.     Info-Tech hired Mendonsa in a position performing many of the same functions as her role as a Senior Director, Analyst for Gartner.

71.     To excel in her Senior Director, Analyst role, Gartner trained Mendonsa as a subject matter expert on its research methodologies, playbooks, and strategies.

72.     In turn, Mendonsa gained intimate knowledge of Gartner's research content tailored to clients' specialized needs and identification of clients' mission critical priorities.  More specifically, Mendonsa regularly accessed, used and relied upon Gartner's research methodologies, playbooks, and the strategies Gartner employs to monetize and expand its research offerings, among other things.  Through her Gartner employment, Mendonsa also learned how to advance Gartner research content; educate clients on advances, changes, and new trends or issues in a particular market; and tailor Gartner's offerings to fit its clients' specialized needs and priorities.  Each of these knowledge segments individually, and all the more collectively, is highly valuable to a Gartner competitor, like Info-Tech.

73.     Armed with this and other specialized information, Mendonsa regularly spoke to and advised Gartner's clients. Indeed, between March 2022 and April 2023, Mendonsa interfaced with at least 370 Gartner clients, many of whom provided sensitive information around their businesses, priorities, goals and growth areas to Mendonsa as part of the engagement.  This direct client exposure afforded Mendonsa with unique opportunities to establish deep and meaningful connections with clients and subsequently assist them with their mission-critical priorities.

74.     In her Info-Tech role, a position substantially similar to her Senior Director, Analyst role, Mendonsa inevitably will draw from her Gartner experience. In particular, Mendonsa will utilize her experience identifying Gartner's clients' mission critical business priorities and delivering compelling client interactions – the same clients for whom Gartner competes for customer spend.

75.     Additionally, upon her resignation, Mendonsa misrepresented her post-employment plans to Gartner.  More specifically, Mendonsa told multiple Gartner representatives she was resigning to tend to personal and health-related issues. She also circulated a farewell email stating she was stepping away from work and heading into a "life of obscurity" that would feature "[l]onger sleep, hot tub soaks, longer walks, longer trips in the travel trailer with the family, longer evenings with the kids and hubby."

76.     Gartner also made considerable efforts to retain Mendonsa, including offering various accommodations and adjustments to her duties, workload and schedule, but Mendonsa reiterated her desire to step away from the workplace for personal reasons.

77.     Despite Mendonsa's representations, Mendonsa commenced employment at Info-Tech almost immediately after her Gartner resignation.

78.     Mendonsa's last day at Gartner was April 7, 2023, and within less than three weeks, she was participating in calls with Info-Tech designed to win business from Gartner.

79.     This timing makes plain that Mendonsa had received, or was about to receive, an offer of employment from Info-Tech at the very same time she was telling her Gartner colleagues – again and again – that she was stepping away from the workplace for personal and health reasons.

80.     This subterfuge was no doubt intended to conceal her plans to join Info-Tech and unlawfully compete against Gartner.

81.     Additionally, on February 13, 2023 – even before her resignation – Mendonsa sent a confidential Gartner document to her personal email. That document, "the Gartner 2023 Top Technology Trends for Government," is explicitly marked "not for external distribution" and contains Gartner insight about how to market and utilize Gartner's technological offerings to government clients. The document falls squarely within the Agreement's definition of Confidential Information.

82.     Mendonsa's access to this kind of information, coupled with Mendonsa's expertise in, experience with and knowledge of Gartner's client base, brand messaging and research scheme are valuable assets to Info-Tech.

83.     On May 5, 2023, Gartner, through its counsel, sent Mendonsa and Info-Tech letters regarding Mendonsa's post-employment contractual obligations to Gartner. *See* Letters to Mendonsa, **Exhibit G**.  Gartner also included copies of Mendonsa's Agreement in its letters.

84.     The letter to Mendonsa sought specific assurances from Mendonsa related to her post-employment obligations to Gartner.  Gartner demanded, among other things, that Mendonsa confirm she is not engaging in any conduct violative of her Agreement, including her existing employment with Info-Tech.

85. Mendonsa never responded to Gartner's May 5, 2023 correspondence.

86. This letter followed the reminder Gartner sent to Mendonsa on April 7, 2023 regarding her post-employment obligations, which Mendonsa forwarded to her personal email account prior to departing. *See* April 7, 2023 Email, **Exhibit H**.

87. In its letter to Info-Tech, Gartner informed Info-Tech of Mendonsa's breaches of her post-employment obligations to Gartner. The letter to Info-Tech also demanded, in part, that Info-Tech provide Gartner with a description of each of Mendonsa's duties and responsibilities at Info-Tech to determine the nature and extent of her breaches.

88. On May 10, 2023, counsel for Info-Tech sent an email to counsel for Gartner, stating in relevant part, "I've not had a chance for a substantive review with the client yet, but once I have, I'll be back in touch in response." Counsel for Info-Tech never provided any substantive response or additional information related to Mendonsa's Info-Tech employment. On May 16, 2023, counsel for Info-Tech sent correspondence to counsel for Gartner, simply concluding "Ms. Mendonsa's employment with Info-Tech does not pose a threat of harm to Gartner."

89. In employing Mendonsa, Info-Tech knew it was inducing a breach of her lawful contractual obligations to Gartner.

90. Info-Tech has induced Mendonsa's breaches for the purpose of harming Gartner and tarnishing its name, reputation and client relationships.

91. Info-Tech also has engaged in a pattern of copying various of Gartner's proprietary works including service descriptions, catalogue entries, and price lists as part of Info-Tech's own commercial listings. Earlier this year, one of Gartner's former employees, upon joining Info-Tech, assisted the company in submitting a commercial bid, which included a proprietary "writing sample" on Gartner letterhead, with a Gartner copyright notice, and featuring Gartner trademarks.

Neither the former Gartner employee nor Info-Tech was authorized by Gartner to use or disclose this material, let alone as part of a competitor's bid.

92.    Mendonsa has direct knowledge of, among other things, Gartner strategic information concerning research methodologies, playbooks and strategic opportunities. More specifically, Mendonsa's role focused on developing a deep understanding of the markets in which she specialized, the Gartner clients who operate within them, the priorities and needs of those businesses and how to establish the kind of meaningful and trusting relationships that enable these clients to make the best possible decisions on the toughest challenges they have to confront. Mendonsa also has intimate knowledge of clients' mission-critical priorities, preferences, and needs – as well as the products and services they have purchased from Gartner – which is presumably why Info-Tech included her on the April 27, 2023 client call.

93.    Mendonsa's role at Info-Tech necessarily will require her reliance on and use of this proprietary information to develop and refine Info-Tech's own competitive products, tools, and services and market them to Gartner's clients and prospective clients, all to Gartner's substantial detriment.

94.    This will allow Info-Tech to gain an unfair competitive advantage over Gartner and cause and further induce Mendonsa to unlawfully compete with her former employer.

95.    Gartner's business in this specialized space, including its relationships with its clients, employees, vendors, and other partners, remains at significant risk due to Mendonsa's continued violations of her contractual obligations to Gartner and Info-Tech's inducement of Mendonsa to do so.

96.    Info-Tech's and Mendonsa's actions have damaged, and will continue to damage, Gartner and must be enjoined.

97.     In particular, Info-Tech's and Mendonsa's actions have diminished the value of Gartner's confidential and proprietary information, harmed Gartner's relationships with its customers and employees, and damaged Gartner's goodwill, reputation, and competitive advantage.

## COUNT I
### Breach of Contract – Non-Competition
### (Injunctive Relief and Damages)
### Against Mendonsa

98.     Gartner realleges and incorporates by reference Paragraphs 1 through 97 as though fully set forth herein.

99.     Mendonsa entered into the Agreement with Gartner on January 22, 2007.

100.    Gartner provided Mendonsa with gainful employment and access to and actual provision of confidential and proprietary information in exchange for executing the Agreement.

101.    The Agreement is a valid and enforceable contract.

102.    Among other obligations under the Agreement, Mendonsa agreed and was obligated, for a period of one (1) year following the termination of her employment with Gartner, to refrain from engaging in any "Competitive Acts" (as defined within the Agreement).

103.    The Agreement generally defines "Competitive Acts," in part, to include: development, marketing or selling of - or assisting others to develop, market or sell - a product or service which is competitive with the products or services of the Employer (both those existing during the Employment and those which are planned for the future and of which the Employee learns during the Employment), and the solicitation, directly or indirectly, of the Employer's clients or known prospects for the purposes of developing, marketing or selling such products or services, by the Employee (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise).

104.    The terms of the Agreement do not pose an undue hardship on Mendonsa.

105.    The Agreement is not injurious to the public.

106.    Gartner has fully performed its contractual obligations with Mendonsa under the Agreement.

107.    The terms of the Agreement are not greater than required for the protection of Gartner's legitimate business interests, including its confidential information and goodwill with its customers.

108.    Info-Tech is a direct competitor of Gartner who regularly and directly competes with Gartner for business, including its attempt to have Mendonsa help steal business from a longstanding Gartner client on April 27, 2023. Info-Tech attempted to exploit Mendonsa's relationship with and knowledge of this client to unlawfully steal the client and usurp Gartner's market share.

109.    Mendonsa's Info-Tech employment and, more specifically, her participation in this poaching effort (and potentially others), directly contravene Mendonsa's promise not to "solicit[], directly or indirectly, [any] of the Employer's clients or known prospects for the purposes of developing, marketing or selling [a competitor's] products or services, by the Employee." *See* Agreement, ¶ 5(a)(i).

110.    Gartner's business includes providing clients with insights, advice, and tools to help them achieve their mission critical priorities.  Gartner's guidance and advice – all driven from its specialized research – includes competitive analysis reports, industry overviews, market trend data, research notes, and product evaluation reports, and Gartner provides its clients with access to its world class teams of analysts and advisors, as well as technology management, technology selection and consulting services.

111.    Similarly, Info-Tech provides research, advisory and consulting services including business insights, business plan assessments, marketing and strategy valuations and risk assessments within the IT industry.

112.    At Info-Tech, Mendonsa is working in substantively the same role she held at Gartner and is violating her Agreement with Gartner.

113.    Through her Info-Tech employment, Mendonsa has and will continue to engage in the conduct from which she agreed to refrain – namely, soliciting Gartner clients.

114.    Specifically, Gartner provided Mendonsa with specialized training and confidential and proprietary information that Mendonsa will rely upon and use in her Info-Tech employment, such as Gartner's research methodologies, playbooks and strategies.

115.    Mendonsa also has intimate knowledge of Gartner's research content tailored to its clients' specialized needs and mission critical priorities.  Also as part of her Gartner employment, Mendonsa is highly attuned to Gartner research methodologies, playbooks and the strategies Gartner employs to monetize and expand its research offerings, among other things.  Through her Gartner employment, Mendonsa also learned how to advance Gartner research content; educate clients on advances, changes, and new trends or issues in a particular market; and tailor Gartner's offerings to fit its clients' specialized needs and priorities.

116.    In addition to her keen understanding of Gartner's research platform, Mendonsa has a sharp knowledge of Gartner's offerings and the strategies Gartner employs to monetize and expand the research segment of its business, among other things.

117.    Mendonsa violated the Agreement by virtue of accepting employment with Info-Tech, a direct Gartner competitor, to research, develop, produce, market or sell products or services that are competitive with the services Mendonsa provided while at Gartner.

118.    Gartner has suffered and will continue to suffer damages as a result of Mendonsa's breach of contract, including diminished value of its confidential information, damaged goodwill with customers, and loss of its competitive advantage.

119.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

120.    Gartner has demonstrated that Mendonsa, unless enjoined, will continue to engage in conduct that breaches her Agreement with Gartner.

121.    Mendonsa's actions will continue to harm Gartner if not enjoined.

122.    Should the Court grant injunctive relief to Gartner, the burden on Mendonsa would be slight compared to the injury to Gartner if injunctive relief is not granted.

123.    Further, Mendonsa agreed injunctive relief would be an appropriate remedy in the event she breached the Agreement.

124.    Granting an injunction will not disserve the public interest.  Indeed, injunctive relief is consistent with the Agreement between the parties.

**WHEREFORE**, Gartner prays for judgment against Mendonsa and requests the Court grant the following relief:

A.    Entry of a Temporary Restraining Order against Mendonsa consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

B.    Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Mendonsa enjoining her from soliciting Gartner clients and working for Info-Tech for the full duration of the non-compete period as contemplated by the Agreement's tolling provisions; and disclosing or using

Gartner's confidential, proprietary and trade secret information in violation of the Agreement's confidentiality provision;

C.  Entry of a declaratory judgment in favor of Gartner, and against Mendonsa, finding that the conduct complained of is illegal and unfair and violates the Agreement between the Parties;

D.  For actual, compensatory, and exemplary damages to be determined at trial;

E.  Attorneys' fees and costs; and

F.  Such other and further relief the court deems just.

## COUNT II
### Tortious Interference with Contractual Relations
### (Injunctive Relief and Damages)
### Against Info-Tech

125.    Gartner realleges and incorporates by reference Paragraphs 1 through 124 as though fully set forth herein.

126.    Mendonsa signed a valid and enforceable Agreement in which she promised, among other things, not to compete and not to disclose Gartner's trade secrets and confidential information.

127.    Info-Tech hired Mendonsa in a role substantively similar and directly competitive with her former Gartner role.  As such, Info-Tech hired Mendonsa into a role which necessarily requires her to breach the Agreement, as her employment constitutes a "Competitive Act" as defined in the Agreement. Among other things, "[c]ompetitive [a]ct" is defined as "solicit[]ing, directly or indirectly, [any] of the Employer's clients or known prospects for the purposes of developing, marketing or selling [a competitor's] products or services, by the Employee." *See* Agreement, ¶ 5(a)(i).

128.    Info-Tech had knowledge of the Agreement and Mendonsa's contractual obligations to Gartner. Info-Tech knew its employment of Mendonsa would cause her to breach her Agreement with Gartner.

129.    Info-Tech nevertheless intentionally interfered with Gartner and Mendonsa's contractual relationship by inducing her to breach her contract by joining Info-Tech. Info-Tech further interfered by inducing Mendonsa to disclose trade secrets and confidential information and join a competitive business, especially considering the companies' similarities and competitive natures and the fact Info-Tech hired Mendonsa into a role substantively similar to her Gartner position.

130.    Info-Tech hired Mendonsa into a role which will require her to engage in the research, development, production, marketing or selling of (or assist others to do so) a product or service which is competitive with the existing or planned products of Gartner with which Mendonsa was intimately involved during her employment with Gartner.

131.    Info-Tech's intentional interference with the contractual relationship between Gartner and Mendonsa was improper and without justification. Info-Tech knew Mendonsa was bound by the restrictive covenants in the Agreement yet, nevertheless, improperly induced and knowingly and intentionally employed her in violation of those covenants.

132.    Info-Tech's actions were improper, unjustified, malicious, and in reckless disregard for Gartner's rights, entitling Gartner to damages. Info-Tech induced Mendonsa to violate her Agreement, in furtherance of Info-Tech's scheme to hire former Gartner employees, like Mendonsa, to build its workforce to unfairly compete with Gartner, specifically by taking advantage of Gartner's well-established client relationships. Info-Tech's unlawful scheme also

seeks to increase its sales and generate more revenue at the expense of Gartner's business and with the help of Mendonsa's and others' knowledge and expertise.

133.    Gartner has suffered and will continue to suffer damages and irreparable harm as a direct result of Info-Tech's tortious interference with contractual relations, including diminished value of its confidential information, harm to its goodwill and reputation and loss of its competitive advantage.

134.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

135.    Info-Tech's actions will continue to cause irreparable harm and damages to Gartner if not restrained.

**WHEREFORE**, Gartner prays for judgment against Info-Tech and requests the Court grant the following relief:

A.  Entry of a Temporary Restraining Order against Mendonsa consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Info-Tech enjoining it from interfering with Gartner's contractual relationships with Mendonsa and other Gartner employees subject to valid and enforceable post-employment obligations;

C.  For actual, compensatory and exemplary damages to be determined at trial; and

D.  Such other and further relief the court deems as just.

<u>COUNT III</u>
**Trade Secrets Misappropriation Under the Connecticut Uniform Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against All Defendants**

136.    Gartner realleges and incorporates by reference Paragraphs 1 through 135 as though fully set forth herein.

137.    The Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 *et seq.*, prohibits the misappropriation of trade secrets.  Under the Act, a trade secret means "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Conn. Gen. Stat. § 35-51(d).

138.    Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."  Conn. Gen. Stat. § 35-51(a).

139.    Gartner dedicated substantial time and resources towards developing business methods, research products, techniques, strategies, means of operation, client lists, compilations of sensitive and proprietary client information and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information.  In particular, Gartner's trade secrets include its research methodologies, product and service offerings (past, present and future), client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and purchasing information and go-to-market strategies for various Gartner solutions, among other things.

140.    This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Gartner allows its employees access to this information only after they have executed confidentiality and non-competition agreements, like Mendonsa's Agreement.  Gartner also requires its employees, like Mendonsa, to complete Data Protection Training as part of Gartner's provision of confidential information to employees.

141.    Mendonsa had knowledge of Gartner's confidential information and trade secrets, including but not limited to its research methodologies, playbooks, and the strategies Gartner employs to monetize and expand its research offerings, among other things.

142.    On a more granular level, Mendonsa served Gartner vendors in three distinct segments: Grants Management, Community Development and Regulations, and ERP Solutions for Government. She gained expertise in these segments by: utilizing Gartner's Secondary Research Services to identify vendors in each market; arranging and attending vendor briefings with selected

vendors in each market; gathering knowledge from her direct peers and from associates in Gartner Consulting who know these markets.

143.    In addition, as a Gartner analyst, Mendonsa regularly advised Gartner clients via briefings and conferences on a variety of niche topics, including digital and IT strategy, ERP, sector-specific IT solutions, and emerging technologies.  On a more granular level, Mendonsa produced highly-visible and valuable research on COVID-spending by Governments, which was recognized as differentiated and sought-after by Gartner clients. Gartner Sales leadership recognized this body of work as a powerful aid in helping secure new business and retain existing revenue. This COVID-related work made Mendonsa an even more in-demand Gartner analyst, enabling her to forge deep and impactful relationships with Gartner clients during their most turbulent and vulnerable times.  These bonds continued to flourish after the pandemic, with high demand for Mendonsa's partnership enduring throughout her last day at Gartner.

144.    Through her Gartner employment, Mendonsa also learned how to advance Gartner research content; educate clients on advances, changes, and new trends or issues in a particular market; and tailor Gartner's offerings to fit its clients' specialized needs and priorities.

145.    To prepare Mendonsa for her role, Gartner required her to attend and successfully complete "Getting to Know Gartner," a training which includes in-depth programming on Gartner brand messaging, which is critical to Gartner's organizational success.

146.    Mendonsa knew she had a duty to maintain the secrecy of Gartner's trade secrets due to her acknowledgement of such under the Agreement.

147.    Notwithstanding, and in blatant disregard of her lawful post-employment restrictions, Mendonsa sent a confidential Gartner document to her personal email on February 13, 2023.

148.    That document, "the Gartner 2023 Top Technology Trends for Government," contains Gartner insight about how to market and utilize Gartner's technological offerings to government clients, and falls squarely within the Agreement's definition of Confidential Information.

149.    Info-Tech is under a duty not to accept any misappropriated trade secrets, including Gartner's trade secrets.

150.    Info-Tech also is under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

151.    By virtue of Mendonsa's new position with Info-Tech, her February 13 email sending confidential Gartner information and trade secrets to her personal email, and the significant overlap between her Info-Tech and Gartner duties and responsibilities, Mendonsa has threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of Info-Tech.

152.    Upon information and belief, Info-Tech has not taken any actions to prevent Mendonsa from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

153.    Info-Tech hired Mendonsa to benefit from her intimate knowledge of Gartner's trade secret, proprietary, and confidential information.

154.    In light of the similarities between Mendonsa's Gartner and Info-Tech roles, and the fact the companies are direct competitors, Mendonsa necessarily will disclose or continue to disclose and utilize Gartner's trade secrets in the course of her Info-Tech employment.  Indeed, Mendonsa already has contributed to at least one Info-Tech effort to poach a Gartner client – a client about whom she acquired intimate knowledge solely by virtue of her Gartner employment.

155.    It is impossible for Mendonsa to separate the knowledge she acquired at Gartner from her parallel research- and client-driven role at Info-Tech, particularly where Info-Tech and Gartner compete for the same customer spend.

156.    Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, goodwill, customer relationships and its competitive advantage.

157.    Gartner has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

158.    Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

159.    Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A.    Entry of a Temporary Restraining Order against Mendonsa and Info-Tech consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

B.    Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Mendonsa and Info-Tech, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act, and any other applicable relief;

C.  For actual, compensatory, and exemplary damages to be determined at trial;

D.  For attorneys' fees in accordance with the Connecticut Uniform Trade Secrets Act; and

E.  Such other and further relief the court deems just.

## COUNT IV
### Trade Secrets Misappropriation Under the Defend Trade Secrets Act
### (Injunctive Relief and Damages)
### Against All Defendants

160.    Gartner realleges and incorporates by reference Paragraphs 1 through 159 as though fully set forth herein.

161.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

162.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

163.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake."  18 U.S.C. § 1839(5).

164.    Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

165.    Gartner dedicated substantial time and resources towards developing research and business methods, techniques, strategies, means of operation, customer lists and other trade secrets that provide economic value and give Gartner an advantage over its competitors who have not compiled this information.   In particular, Gartner's trade secrets include its research methodologies, product and service offerings (past, present and future), sales enablement techniques, methods for setting research priorities and agendas, client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and

purchasing information; and go-to-market strategies for various Gartner solutions, among other things.

166.     This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret and available for Gartner's commercial use only.  Gartner allows its employees access to this information only after they have executed confidentiality and non-competition agreements, like the Agreement Mendonsa executed.

167.     After executing the Agreement, Mendonsa had access to Gartner's confidential information and trade secrets for the customer relationships which she was responsible for developing and maintaining on behalf of Gartner, so that she could perform her job and increase customer goodwill on behalf of Gartner.

168.     This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Among other things, Gartner requires its employees, like Mendonsa, to complete Data Protection Training as part of Gartner's provision of confidential information to employees.

169.     Mendonsa had access to Gartner's confidential information and trade secrets for the clients she advised.

170.     Mendonsa had knowledge of Gartner's confidential information and trade secrets, including but not limited to its research methodologies, playbooks, and the strategies Gartner employs to monetize and expand its research offerings, among other things.

171.     On a more granular level, Mendonsa served Gartner vendors in three distinct segments: Grants Management, Community Development and Regulations, and ERP Solutions for Government. She gained expertise in these segments by: utilizing Gartner's Secondary Research Services to identify vendors in each market; arranging and attending vendor briefings with selected vendors in each market; gathering knowledge from her direct peers and from associates in Gartner Consulting who know these markets.

172.     In addition, as a Gartner analyst, Mendonsa regularly advised Gartner clients via briefings and conferences on a variety of niche topics, including digital and IT strategy, ERP, sector-specific IT solutions, and emerging technologies.  On a more granular level, Mendonsa produced highly-visible and valuable research on COVID-spending by Governments, which was recognized as differentiated and sought-after by Gartner clients. Gartner Sales leadership recognized this body of work as a powerful aid in helping secure new business and retain existing revenue. This COVID-related work made Mendonsa an even more in-demand Gartner analyst, enabling her to forge deep and impactful relationships with Gartner clients during their most turbulent and vulnerable times.  These bonds continued to flourish after the pandemic, with high demand for Mendonsa's partnership enduring throughout her last day at Gartner.

173.     Through her Gartner employment, Mendonsa also learned how to advance Gartner research content; educate clients on advances, changes, and new trends or issues in a particular market; and tailor Gartner's offerings to fit its clients' specialized needs and priorities.

174.     To prepare Mendonsa for her role, Gartner required her to attend and successfully complete "Getting to Know Gartner," a training which includes in-depth programming on Gartner brand messaging, which is critical to Gartner's organizational success.

175.    Mendonsa knew she had a duty to maintain the secrecy of Gartner's trade secrets due to her acknowledgement of such under the Agreement.

176.    Notwithstanding, and in blatant disregard of her lawful post-employment restrictions, Mendonsa sent a confidential Gartner document to her personal email on February 13, 2023.

177.    That document, "the Gartner 2023 Top Technology Trends for Government," contains Gartner insight about how to market and utilize Gartner's technological offerings to government clients and falls squarely within the Agreement's definition of Confidential Information.

178.    Info-Tech is under a duty not to accept any misappropriated trade secrets, including Gartner's trade secrets.

179.    Info-Tech also is under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

180.    By virtue of Mendonsa's new position with Info-Tech, her February 13 email sending confidential Gartner information and trade secrets to her personal email, and the significant overlap between her Info-Tech and Gartner duties and responsibilities, Mendonsa has threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of Info-Tech.

181.    Upon information and belief, Info-Tech has not taken any actions to prevent Mendonsa from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

182.    Info-Tech hired Mendonsa to benefit from her intimate knowledge of Gartner's trade secret, proprietary and confidential information.

183.     In light of the similarities between Mendonsa's Gartner and Info-Tech roles, and the fact the companies are direct competitors, Mendonsa necessarily will disclose or continue to disclose and utilize Gartner's trade secrets in the course of her Info-Tech employment.  Indeed, Mendonsa already has contributed to at least one Info-Tech effort to poach a Gartner client –  a client about whom she acquired intimate knowledge solely by virtue of her Gartner employment.

184.     It is impossible for Mendonsa to separate the knowledge she acquired at Gartner from her parallel research- and client-driven role at Info-Tech, particularly where Info-Tech and Gartner compete for the same customer spend.

185.     Defendants' actions constitute misappropriation, or at the very least threatened misappropriation, in violation of the Defend Trade Secrets Act.

186.     Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships and its competitive advantage.

187.     Gartner has no adequate remedy at law for such present and future harm, and therefore is entitled to equitable relief in addition to compensatory relief.

188.     Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

189.     Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A.  Entry of a Temporary Restraining Order against Mendonsa and Info-Tech consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Mendonsa and Info-Tech, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act, and any other applicable relief;

C.  For actual, compensatory, and exemplary damages to be determined at trial;

D.  For attorneys' fees in accordance with the Defend Trade Secrets Act; and

E.  Such other and further relief the court deems just.

**COUNT V**
**Violation of the Connecticut Unfair Trade Practices Act**
**(Injunctive Relief and Damages)**
**Against Info-Tech**

190.    Gartner realleges and incorporates by reference Paragraphs 1 through 189 as though fully set forth herein.

191.    Info-Tech violated Gartner's common-law right to enforce the Agreement, a valid and enforceable contract.

192.    Info-Tech's conduct was intentional. Info-Tech continued to employ Mendonsa after Gartner sent it correspondence on May 5, 2023, informing Info-Tech such employment violated Mendonsa's post-employment obligations to Gartner.

193.    Info-Tech's conduct substantially injures its competitors, like Gartner, where it induces breaches of its employees' lawful post-restrictive covenants to their former employers. Specifically, Info-Tech induced Mendonsa to breach her non-compete (including a customer non-

solicit provision) and confidentiality and non-disclosure post-employment obligations to Gartner, as set forth in the Agreement.

194.    Info-Tech also has engaged in a deceptive campaign to mislead and confuse the public and Gartner's current and prospective clients.

195.    Among other things, on April 27, 2023, Info-Tech had a sales call with one of Gartner's longstanding clients. Mendonsa participated on this call, on Info-Tech's behalf, to showcase Info-Tech's offerings which are directly competitive with those of Gartner.  Mendonsa has intimate knowledge of Gartner's highly confidential and strategic information concerning research methodologies, playbooks and strategic opportunities. Mendonsa also has a keen understanding of Gartner clients and the priorities and needs of those businesses, among other things. This information is highly valuable to Gartner competitors, like Info-Tech, who competes for these same clients.

196.    The client apprised Gartner of Info-Tech's pitch – and Mendonsa's participation – because Mendonsa's new affiliation with Info-Tech, one of Gartner's primary competitors, confused the client.  In fact, the client informed Gartner it did not understand why Mendonsa was pitching and advertising Info-Tech products.

197.    Info-Tech's website also has pages specifically devoted to Gartner to unfairly and deceptively use Gartner's name and recognition in the industry to its advantage and to confuse and mislead the public.   For instance, on its own website, Info-Tech pinpoints Gartner's "influential Magic Quadrants"[8] – one of Gartner's most distinctive and prestigious publications.

198.    Info-Tech also has engaged in a pattern of copying various of Gartner's proprietary works including service descriptions, catalogue entries, and price lists as part of Info-Tech's own

---

[8]    *See* https://www.infotech.com/research/slack-expands-data-residency-6-ecms-that-users-like-and-more-news-of-the-week (accessed May 5, 2023).

commercial listings. Earlier this year, one of Gartner's former employee, upon joining Info-Tech, assisted the company in submitting a commercial bid, which included a proprietary "writing sample" on Gartner letterhead, with a Gartner copyright notice, and featuring Gartner trademarks.

199.    Info-Tech is capitalizing upon Gartner's premier industry rank – specifically by poaching Gartner's employees, like Mendonsa  –  to increase its visibility in the industry.

200.    Gartner has no affiliation with or connection to Info-Tech.   Info-Tech's misrepresentations to the contrary are unethical and unscrupulous.

201.    Info-Tech is unfairly and deceptively using Gartner's name, branding and likeness and recognition in the industry to its advantage to confuse and mislead the public.   Such misrepresentations directly impact Gartner and its ongoing and prospective client relationships.

202.    Info-Tech also is misrepresenting its connection to or affiliation with Gartner to increase its visibility in the industry.  Info-Tech is leveraging Gartner's name and reputation to publicly strengthen its own credibility in the marketplace, all to Gartner's detriment.

203.    Info-Tech's unfair methods of competition and its unfair and deceptive acts have a direct effect on the general consuming public.

204.    Info-Tech's unfair and deceptive acts have and will continue to harm Gartner and its current and prospective client relationships if not enjoined.

**WHEREFORE**, Gartner prays for judgment against Info-Tech and requests the Court grant the following relief:

A.  Entry of a Temporary Restraining Order against Mendonsa and Info-Tech consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Info-Tech, enjoining it from engaging in anti-competitive activity, specifically by inducing breaches of its employees' lawful post-employment obligations to their former employers; and improperly using Gartner's name and likeness in its internal and external marketing, promotional, operational, and other business materials, and any other applicable relief;

C.  For actual, compensatory, exemplary and punitive damages to be determined at trial; and

D.  Such other and further relief the court deems as just.

**<u>COUNT VI</u>**
**Violation of the Lanham Act for False Association and Unfair Competition**
**15 U.S.C. § 1125**
**(Injunctive Relief and Damages)**
**Against Info-Tech**

205.    Gartner realleges and incorporates by reference Paragraphs 1 through 204 as though fully set forth herein.

206.    Info-Tech's repeated use of Gartner's name on its website and other marketing materials, is calculated to, has caused, and is likely to cause confusion and deception.

207.    Since 2012, Info-Tech has targeted Gartner in its marketing materials in an attempt to usurp Gartner's market share and poach its clients.

208.    Info-Tech also uses the same fonts and colors as Gartner to create further brand confusion and to deceive as to the affiliation, connection, or association between Gartner and Info-Tech.

209.    Info-Tech's website and other public-facing marketing and promotional materials publicize a false connection to and/or affiliation with Gartner through repeated and unauthorized use of Gartner's name, branding and likeness.

210.    Info-Tech makes various connections to Gartner throughout its website to unfairly and deceptively use Gartner's name and recognition in the industry and to cause confusion and to deceive as to the affiliation, connection or association between Gartner and Info-Tech.

211.    As a consequence of Info-Tech's misuse of Gartner's name on its website and Gartner's branding and likeness, the public and Gartner's current and prospective clients are likely to believe that Info-Tech and its services are affiliated, associated, or connected with Gartner.

212.    Info-Tech also has engaged in a pattern of copying various of Gartner's proprietary works including service descriptions, catalogue entries, and price lists as part of Info-Tech's own commercial listings. Earlier this year, one of Gartner's former employee, upon joining Info-Tech, assisted the company in submitting a commercial bid, which included a proprietary "writing sample" on Gartner letterhead, with a Gartner copyright notice, and featuring Gartner trademarks.

213.    Info-Tech intentionally tailors its branding, name and website to be confusing and deceptive regarding a purported affiliation, association or connection with Gartner.

214.    Mendonsa's effort to poach Gartner's longstanding client – with whom she worked closely during her Gartner tenure – furthers its confusing and deceptive scheme to unfairly compete with Gartner and mislead the public and Gartner's current and prospective clients.

215.    Gartner has no affiliation with or connection to Info-Tech. Info-Tech's misrepresentations to the contrary are unethical and unscrupulous.

216.    Info-Tech, through its acts set forth above, has made and will continue to make profits to which it is not in equity or good conscience entitled.

217.    Info-Tech's wrongful acts and unauthorized use of Gartner's name, branding and likeness has and will continue to cause Gartner substantial injury, including loss of clients, dilution of its reputation, dilution of its goodwill, confusion of its existing and potential customers, loss of reputation, and diminution of its confidential, proprietary and trade secret information.

218.    By reason of Info-Tech's intentional and willful conduct, Gartner has been and will continue to be irreparably harmed unless Info-Tech is permanently enjoined from its wrongful conduct.

219.    Gartner is entitled to recover from Info-Tech all damages it has sustained and will sustain, and all gains, profits and advantages obtained by Info-Tech as a result of its unlawful acts, in an amount to be determined at trial.

**WHEREFORE**, Gartner prays for judgment against Info-Tech and requests the Court grant the following relief:

A.  Entry of a Temporary Restraining Order against Info-Tech consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Info-Tech, enjoining it from improperly using Gartner's name and likeness in its internal and external marketing, promotional, operational, and other business materials, and any other applicable relief;

C.  For actual, compensatory, exemplary and treble damages to be determined at trial; and

D.  Such other and further relief the court deems as just.

## **PRAYER FOR RELIEF**

With respect to this Complaint, and based on the foregoing, Plaintiff Gartner, Inc. prays for the following relief:

1. Entry of a Temporary Restraining Order against Mendonsa consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

2. Entry of a Temporary Restraining Order against Info-Tech consistent with the relief as requested in Gartner's Motion for a Temporary Restraining Order and Memorandum in Support;

3. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Mendonsa enjoining her from soliciting Gartner clients and working for Info-Tech for the full duration of the non-compete period as contemplated by the Agreement's tolling provisions; and disclosing or using Gartner's confidential, proprietary and trade secret information in violation of the Agreement's confidentiality provision;

4. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Info-Tech, enjoining it from interfering with Gartner's contractual relationships with Mendonsa and other Gartner employees subject to valid and enforceable post-employment obligations;

5. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Info-Tech, enjoining it from improperly using Gartner's name and likeness in its internal and external marketing, promotional, operational, and other business materials;

6.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Info-Tech, enjoining it from engaging in anti-competitive activity, specifically by inducing breaches of its employees' lawful post-employment obligations to their former employers; and improperly using Gartner's name and likeness in its internal and external marketing, promotional, operational, and other business materials, and any other applicable relief;

7.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Mendonsa and Info-Tech, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act;

8.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Mendonsa and Info-Tech, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act;

9.  For actual, compensatory, treble, punitive and exemplary damages to be determined at trial;

10. Attorneys' fees and costs; and

11. Such other and further relief the court deems as just.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Gartner, Inc. hereby asserts its right to a trial by jury on all counts so triable.

Dated:  May 17, 2023

Respectfully submitted,

GARTNER, INC.

By:  /s Daniel A. Schwartz
Daniel A. Schwartz (ct15823)
Sheridan L. King (ct31197)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103
Tel: (860) 251-5038
DSchwartz@goodwin.com
sking@goodwin.com

Christopher Collins
Bar No.: CT29869
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

Kevin M. Cloutier, Esq.
(*pro hac vice* admission pending)
Illinois Bar No.: 6273805
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com

*Counsel for Plaintiff Gartner, Inc.*