IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

GARTNER, INC.,

                              Plaintiff,

         vs.                                          Civil No. 23-cv-00642

INFO-TECH RESEARCH GROUP, INC., a Delaware
Corporation, and ALIA MENDONSA, an individual,

                              Defendants.

---

# DECLARATION OF ALIA MENDONSA

Alia Mendonsa, under penalty of perjury and pursuant to 28 U.S.C. § 1746,

declares the following to be true and correct:

1.      I am a party to this action.  I make this declaration in opposition to

plaintiff's motion for a temporary restraining order and a preliminary injunction and in support

of my motion to transfer and for judgment on the pleadings.  I have personal knowledge of the

facts recited, and I make this declaration without waiving any defenses.  This declaration will

detail my response to the accusations in this lawsuit, my professional background, my

employment with Gartner, my employment with Info-Tech, and some personal information

relevant to this proceeding.[1]

---

[1]      I am also submitting a separate declaration which I am seeking to have sealed because it
contains personal health information and more detail about my family situation,
including my minor child.

2.      I have been employed by co-defendant Info-Tech Research Group Inc. ("Info-Tech") since April 17, 2023.  I am an Executive Counselor in the Executive Services department at Info-Tech.  Gartner's allegations regarding my purported misuse of sensitive and confidential information and client solicitation at Info-Tech are unfounded.  Further, Gartner was aware that I relocated to California, and my employment agreement with Gartner acknowledges that non-competition covenants will not be enforced against any employee who is employed within the state of California.

3.      Before my employment with Info-Tech, I was an employee of Gartner, Inc., plaintiff in this case, for over 16 years.  I worked primarily in two jobs at Gartner.  Between January 2007 and July 2016, I served in a role that is similar to my current role at Info-Tech.  In July 2016, I moved into the research division of Gartner, which was fundamentally different from my prior position.  I worked in the research role until I resigned in March 2023.  More details about those positions are set forth in this declaration.

**Professional Background and Education**

4.      I am originally from Auburn, California.  I graduated with a Bachelor's of Science Degree in Technological Entrepreneurship and Management from Arizona State University in December 2016.

5.      From February 1999 until January 2007, I worked as a Research Director at the Center for Digital Government, a division of e.Republic, Inc.  In this role, I was responsible for overseeing the organization's research activities.  I handled content delivery via

websites and advisory service programs regarding technology strategy, applications, policy,

procurement process, and funding across a variety of government verticals, including

transportation, finance, health and human services, and tax and revenue.  At the Center for

Digital Government, I learned and sharpened my research and writing skills.  I brought those

skills with me to Gartner when I worked there.

**Employment with Gartner**

6.    I worked with Gartner for about 16 years, starting in 2007.  I resided in

Citrus Heights, California when I started at Gartner and resided in California for all but 2.5 years

of my 16 years with Gartner.  My work was entirely remote with some occasional travel.  I

traveled to Connecticut in 2007, 2008, and 2016 approximately once per year during that entire

time.  Each visit was less than one week in duration.

7.    My original employment offer letter contained provisions regarding

Gartner's company policies, specifically non-disclosure, confidentiality, non-competition, and

non-recruitment provisions, with special provisions for California employees.  The agreement,

which covered my entire time at Gartner and was attached to Gartner's complaint, is addressed in

more detail later in my declaration.

**My Work with Gartner as an Analyst - July 2016-March 2023**

8.    My most recent position as an analyst started in July 2016.  I became an

analyst in the government and education team at Gartner.  I received a written offer regarding the

new position with added conditions that affected only my compensation structure.  The title for

the analyst position was changed universally from Research Director to Senior Director, Analyst but the job duties remained the same for me the entire time.  In this declaration, I am giving a description of my analyst duties in order to correct and clarify Gartner's allegations that I had deep knowledge of Gartner clients that could damage Gartner.  That is simply not accurate.

9.      I chose to take on the position of analyst because it allowed me to return to research, the functional area in which I started my career before I joined Gartner.  It also offered me the opportunity to write and to further develop my presentation development and delivery skills.  I remained as a Gartner analyst until my resignation from Gartner.

10.     As a Gartner analyst, I was part of Gartner's public sector research team, just one of many teams operating at Gartner and with over 1,000 analysts.  I was responsible for the development and presentation of research and content regarding digital government strategy and applications.  Other people were at the same level as me on this team.  When I started as an analyst, there were five analysts within the government team.  That number grew to about twelve analysts during my tenure between 2016 and 2023.  In 2021, there were two management positions created on the team.  While I was interested in a management position, I was denied the opportunity to apply in 2021 when I first sought it out.

11.     As a Gartner analyst, I had several supervisors.  I was six levels down from the C-suite in the reporting structure.  When I began working as a Gartner analyst, I reported to Andrea di Maio.  In May 2021, when additional supervisory positions were created, my direct supervisor was Irma Fabular.  Ms. Fabular was based in San Diego, CA, and she

reported to Andrea di Maio, who resides in Florence, Italy.  Di Maio reported to Eric Rocco.  I had no direct reports.

12.     Effective April 1, 2023, I was to report to Bill Finnerty.  Due to my resignation before that date, I did not have any opportunity to report to Finnerty.  Notably, Finnerty and I both interviewed for that supervisor position.  I was not selected.

13.     As a Gartner analyst, there were no specific Gartner clients assigned to me.  I had no control or ownership over clients or maintaining client relationships and did not service any specific clients.  Rather, my role as a Gartner analyst focused on developing subject-matter expertise to develop and create content that would later *possibly* be utilized by Gartner clients.  My success as an employee was measured according to how often Gartner's clients read the content I and the team created, the number of scheduled inquiries following our delivery of content, and the quality and value rating of the content.  While I would like to think that my work created some value for Gartner clients, by no means was it "mission-critical" as Gartner alleges here.  In reality, the content I delivered was one mere segment of Gartner's expansive program, delivered by hundreds and hundreds of analysts.  My work was not, in and of itself, fundamental or central to achieving clients' mission-critical priorities.

14.     My research content at Gartner was largely based on publicly-available information, including legislation, federal regulations, and funding opportunities.  It was also based on publicly-available vendor information and briefings of public information disseminated by the vendors themselves, and other publicly-available research.  In a few cases, I worked on

content based on the summaries of the results of Gartner surveys distributed to Chief Information

Officers.

      15.    My research content at Gartner was often published to Gartner's online

member website and was available to Gartner's clients.  I am not aware of any efforts by Gartner

to monitor what clients did with the information they obtained through the website.  On

occasion, I also gave public presentations at Gartner's major client conference which was called

Symposium, as well as at other regional events.

      16.    As a Gartner analyst, in addition to creating content, I was also tasked

with delivering presentations to clients and prospective clients.  I did not select or identify

specific clients to speak with, rather they were assigned to me either through an automated

system or through Gartner's Research Engagement Services Group.  I did not initiate, seek, or

attain regular communications with any Gartner clients.  I did not store or maintain any specific

client information, phone numbers, or email addresses.

      17.    As a Gartner analyst, I spoke with hundreds of clients and/or prospects

each year about areas of my experience, but other Gartner employees handled all of the logistics

and scheduling.  I often presented to clients without anything but cursory knowledge of the

client's background, priorities, or a specific person's position within their larger organization.

Under Gartner's method, I was given 15 minutes before client discussion to review additional

information related to the client's question.  I was able to digest and recall just enough

information about the client for the purpose of the discussion.  In order to participate in these

discussions, I simply clicked a link to enter a virtual WebEx meeting that was placed on my

calendar in advance by someone else who was handling the client relationship or assisting with that.  After concluding one client inquiry, I then moved on to the next discussion for another client or prospective client.  I was required to send a follow-up message to the client with a summary of the information I discussed and suggested next steps and further research to read. Typically, the next steps included recommendations to additional analysts the client should speak with.

18.     As a Gartner analyst, I did not cultivate or maintain an understanding of individual client initiatives or priorities, or lay out a programmatic path for leveraging content and resources to achieve it.  Nor was I responsible for follow-up with any client except the limited follow-up described above.  I was not responsible for execution of any program for a client.  All of that was the responsibility of other Gartner personnel, including an Account Executive, Leadership Partner or Executive Partner (the role I played in varying degrees between 2007 and June of 2016, described below).  In essence, my role was solely to answer as many questions as feasible—within a 30 minute window—relevant to my subject matter expertise.  In the year leading up to my departure from Gartner, I participated in about 370 short client discussions like those described above.  Gartner alleges in its complaint at paragraph 7 that I "interfaced with at least 370 Gartner clients."  That number is accurate.  I was not responsible for understanding individual client priorities, or for devising and executing a Gartner support system.  It was not my role to understand each client's priorities intimately, nor did I retain information about specific clients in the process of supporting them.  Due to the sheer volume of discussions I participated in, I generally did not retain information shared by clients, if any was shared at all.  And it was not my role to retain that information in any event.

19.     As a Gartner analyst, I rarely spoke with any one client regularly.  When I would participate in follow-up calls at the client's request to answer additional questions or discuss the topic in more detail, it was very rare that I maintained a cadence of regular conversation with a client for any length of time.  I can think of three instances where I have any recollection of regular conversations with the same client over the years I was a Gartner analyst, and two of them are technology companies, entities I no longer work with in my new role. Usually, once a client's questions were addressed, I did not interact with that client again. Again, follow-up by a client was rare, and I was not ultimately responsible for anything further. I could identify those clients with which I had a semi-regular cadence with if needed, but am not doing so here because of Gartner's (unfounded) allegations of my breach of confidentiality obligations.

20.     I do not deny Gartner's allegation that during 2020 and 2021, much of my work was focused on Covid research and guidance.  But it is not accurate to say, as Gartner alleges in paragraph 24 of its complaint, that I forged "deep and impactful relationships with Gartner clients" as a result.  And that work is all stale now in any event.

21.     As a Gartner analyst, my work was concentrated about 50 percent in working with the technology sector and 50 percent in government organizations.  The clients were primarily in North America, but I did have discussion with clients in Australia and globally on occasion.  The government clients were usually state or local governments.  I did have limited contact with federal agencies as well.

**My Work with Gartner as an Executive**
**Partner January 2007-early July 2016**

22.     When I first started work at Gartner in January 2007, I began working for Gartner Executive Programs ("Gartner EP") as a Relationship Manager. I held this position from January 2007 until about early July 2016. The title of the position changed over time, to Executive Advisor. I was promoted to Executive Partner. All of these positions were fundamentally the same.

23.     In my role with Gartner EP, I was responsible for managing service delivery for public and private Chief Information Officer memberships in the Western region. I served as a leadership coach and concierge to leaders of information technology organizations, and applied Gartner's resources to develop and assist in technological and leadership initiatives for clients. I had regular and continuous contact with the clients I serviced, and I was intimately familiar with their goals, strategies, and pain points. It was part of my job to have a deep understanding of the clients I worked with. I worked with a portfolio of 20-25 Chief Information Officers or equivalent and their direct reports. The Regional Vice President of Executive Programs assigned these clients to me based on geography, resource distribution, and capacity.

24.     Gartner's description of my duties in its complaint inaccurately conflate my two roles. Many of the allegations of access to confidential client information and the like may have been true before 2016, but that is not what my role was for almost seven years. Thus, to the extent I had access to confidential client information at all, it is most certainly stale and now has no competitive use to Gartner—or anyone else.

**My Resignation from Gartner**

25.     In January 2023, I received my annual performance evaluation which rated my performance lower than the year before.  I was disappointed in this and expressed that to my supervisors.  The result of this performance evaluation was that I would not be considered for a promotion and anything other than the standard raise (which was essentially cost-of-living) in the short term and likely not for another year.  One of the reasons expressed to me for the lower rating was that I did not speak at Symposium, Gartner's annual client conference.  I declined speaking at Symposium in 2022 due to my worsening health conditions.  I was also told I did not engage in any "heroics" during the period covering my evaluation, despite my increase in published research reports and new subject matter coverage for Gartner.

26.     I had been considering a move away from the analyst position, and frankly, Gartner, for some time.  Many of us worked above and beyond during 2020 and 2021, specifically addressing urgent Covid-related inquiries.  It was typical to work 14-hour days during this period.  But, post-Covid-crisis, the expectation of performance never returned to normal.  In fact, this spiked level of productivity became the new threshold against which I and others in my position were measured.  It was required to keep publications and inquiry volumes at the Covid-level—which was about double the pre-Covid levels—to drive demand for Gartner's services.

27.     This increased demand required long hours sitting in a chair in order to be available for all the client inquiries plus internal meetings.  There were few breaks.  I was

working long hours at night and/or on weekends to research, write, and develop and prepare for webinar presentations.

28.     There was no work-life balance.  And I was not advancing or getting promoted, which I believed I had earned.  Trying to keep pace with Gartner's expectations (which I believed were unreasonable) came at a great cost to me physically. The position I was in was very stressful because I was constantly expected to be "camera ready" at all times and had almost no control over my own schedule.

29.     In addition, I had developed serious health problems in 2017 of which Gartner was aware and which I will detail for the Court in a sealed submission that will not be available to the public.  Those conditions have continued to worsen over time to present, and I am under regular medical treatment.  In addition, I have two children with special circumstances who are financially dependent on me.  My medical condition, combined with demanding family circumstances (which I will detail in a sealed submission), and the lack of appreciation by Gartner, including lack of advancement, led me to seek other opportunities.  I have physical limitations.  Travel is exceedingly difficult, and traveling by air is not possible.

30.     On March 10, 2023, I resigned from Gartner effective April 7, 2023.  I sent my notice of resignation via email to my supervisors, Mr. di Maio, Ms. Fabular, and Mr. Finnerty.  A copy is attached as **Exhibit A**.  My formal resignation email is not included in or even referred to in Gartner's papers.  I explained this was a personal decision in the best interests of my health and my family.  I wrote:

> "The challenges I have had with my physical health are known.
> Ultimately, the requirements of my position are no longer in
> alignment with my personal needs and physical limitations, which
> I must more urgently prioritize. I have agonized over this, but have
> decided I need to do the right thing for my health and my family
> and take a different path altogether. So, I am submitting my
> resignation from Gartner, effective April 7th. I am so sorry for the
> terrible timing. I will do whatever I can in the coming weeks to
> ensure a transition out that best positions my successor."

31.     Mr. di Maio and I discussed at length my decision to leave Gartner.  He

urged me to reconsider my decision and to stay with Gartner.  He attempted to work with me to

accommodate my health conditions and my family's complex needs.  While I appreciated his

genuine efforts and graciousness, after reflection, I did not have confidence that the

accommodations would actually be met by Gartner long-term, especially after my evaluation and

failure to advance.  Ultimately, on March 16, 2023, I reaffirmed my resignation to Gartner.

32.     During the resignation process, I received a Gartner Confidential

Separation Guide with next steps and information for departing employees.  The separation guide

outlined employee benefits and continued medical coverage, unemployment benefits, payroll,

commissions, and the return of company property and access to Gartner's systems.  The

separation policy required me to return my laptop, monitors, and accessories to Gartner.  I did so.

33.     I also received an email from Gartner titled "Your Post-Employment

Obligations Reminders & Returning Company Assets – USA."  In this email, Gartner instructed

me to return or destroy any copies of "sensitive or confidential information belonging to our

clients or prospects" documents in my possession.  The email also required me to affirm my

compliance with the policy.

- 12 -

34.     I signed a certification from Gartner affirming that I had no client confidential information in my possession.  During this process, I deleted any confidential documents on my personal computer drive.  I also deleted anything that I felt may be of value to Gartner or differentiate Gartner because I wanted to be conservative and honor my obligations.  I retained research articles I drafted for my own personal portfolio.  I also retained public documents and documents which contained publicly-available information.  Shortly after I retained counsel, my counsel notified Gartner of these documents in a letter dated May 30, 2023, a copy of which is attached as **Exhibit B**.   My counsel has sought instruction on how Gartner would like me to handle these documents.

**Gartner Employment Agreement**

35.     When I started working at Gartner, Gartner gave me its form agreement for California Employees." My Gartner Agreement covered my entire time at Gartner, even though my position changed in 2016. It contains restrictions on my post-employment use of Gartner confidential information.  It also contains a non-competition provision which essentially purports to restrict my ability to work for a competitor or Gartner client or vendor within 50 miles of the office I worked in principally at Gartner.  The following language, which is not cited by Gartner in its papers appears in the agreement: ***". . . Any covenant not to compete contained in this section 5 deemed unenforceable by Business and Professions Code section 16600 or California public policy shall be enforceable only outside of the state of California, and Employer agrees that is shall not attempt to enforce this provision outside the State of California while Employee is employed within the state of California."***

- 13 -

36.     The non-competition provision did not apply to me because I resided in California, which was noted specifically in the Gartner Agreement.  And the provision no longer applied to me when I changed my residence back to California.  In fact, the non-competition provision applied to me (if at all) only between November 2020 and December 31, 2022 when I lived in Arizona.

**My Role at Info-Tech is Materially Different
From the Role I Had for the Last Six and a Half Years at Gartner**

37.     In late February 2023, I began speaking with Info-Tech regarding a new employment opportunity as an Executive Counselor in the Executive Services department.[2] What appealed to me about this position was a more flexible schedule which would help me gain a better work-life balance—I could get time away from my computer to move and stretch and eat more regularly, all of which are essential to my management of my medical conditions which are detailed in the accompanying private declaration.  Being an Executive Counselor was similar to the position I had long ago at Gartner (between 2007 and 2016) when I was an Executive Partner.  But being an Executive Counselor at Info-Tech is fundamentally different from my previous role as a Gartner analyst for seven years.  At Info-Tech, I will only have to manage 10-20 accounts in the West region of Info-Tech and primarily California.

---

[2]     This was not the first time I voluntarily explored opportunities with Info-Tech.  I applied for a position in 2021 and again in 2022.

38.     On March 7, 2023, I received an employment offer from Info-Tech.  My base compensation is about the same as my total compensation at Gartner.  The benefits are basically equivalent.  Compensation, though important, was not the driver for this change for me.

39.     I signed an employment agreement with Info-Tech that does not include a non-competition clause.  Included with my employment offer was a certification from Info-Tech regarding my compliance with the terms and conditions of my Gartner employment agreement. This certification outlined my duties to Gartner including the return of Gartner documents, the non-solicitation of Gartner customers, and a statement that I would not use Gartner's confidential and proprietary information.  By signing the certification, I acknowledged my duties to Info-Tech and my continuing duties arising out of my employment with Gartner.  A copy is attached as **Exhibit C**.

40.     No one at Info-Tech has, either in the interview process or during my employment thus far, sought information from me that Gartner may regard as confidential or has alleged is confidential here.  No one has asked me to disclose confidential information that belongs to Gartner.  In fact, Info-Tech has informed me that it will make every effort to ensure that I do not have contact with any client that is known to be a Gartner client for my non-solicitation period.

41.     I began working for Info-Tech as an Executive Counselor on April 17, 2023.  My role is a remote position which I do from my home in California.

42.     At Info-Tech, I am assigned to specific clients and I am responsible for client services and plans for client engagement.  In this role, I do not develop or produce any

research content.  Rather, I leverage Info-Tech's content developed by other Info-Tech

employees to specifically assist the client with their priorities.  My main objective is to cultivate

and maintain an understanding of member initiatives or priorities, and lay out a programmatic

path for leveraging Info-Tech research content and resources for our members to achieve them.  I

serve primarily as a leadership advisor and consigliere to technology leadership.  I work with a

small portfolio of organizations.  I currently work with two clients within California, but expect

my work to extend to about 20 organizations and 20-45 individuals once my onboarding is

complete.  This is a substantially smaller number of clients and geographic footprint as compared

to my work as an analyst at Gartner.  This allows me to have a deep connection to clients and to

assist clients with strategic initiatives.  That is completely different from my role as a Gartner

analyst from 2016 on and something I missed doing in my role as a Gartner analyst.

43.     At Info-Tech, my work is and will be fully in the government sector.  I

will not be working with any tech companies, which was half of my work as a Gartner analyst,

nor will I be tracking specific vendor offerings, a substantial portion of the work and value I

provided as a Gartner analyst.

**Gartner's Allegations Are**
**Not Correct and Are Not Complete**

44.     In its papers, Gartner claims I actively participated in intentional and

deliberate Gartner client solicitation for Info-Tech by attending a Zoom call.  This is incorrect.

45.     On April 19, 2023 (not April 27, as alleged), I attended a video call for

training purposes.  I was informed that the client had already committed to become a client of

Info-Tech.  I did not prepare for the call in any way, nor did I present any materials, or actively participate in the substance of the call.  In fact, I had only been employed by Info-Tech for two days at that time, so I would have had no basis to present anything.  I recognized the individual as someone who had worked with Gartner.  He and I previously met at the Symposium in 2019 and spoke through the inquiry process on an occasion or two during my almost 7 years as a Gartner analyst.  The individual expressed his delight that he would be working with me even though his employer was no longer working with Gartner, and said it was "the right choice." There was no confusion as Gartner claims, and I certainly did not have at Gartner—and do not today—have "intimate knowledge of the client's mission-critical priorities, preferences and needs" or anything about the products and services that this particular client uses as Gartner has alleged.

46.     I did not believe that I was violating any non-solicitation obligation to Gartner because the prospect had already committed to purchasing Info-Tech services before the call was scheduled and before I joined Info-Tech.  And I personally did no solicitation of any sort on that Zoom call, nor did anyone at Info-Tech ask me to do that.  Nor did I give any client confidential information about this client to Info-Tech (though I do not believe I had any to begin with).  I did think, however, that I had a personal conflict because this particular client had done business with a former colleague at Gartner whom I considered a friend.  So, I informed my direct supervisor of my concern and further stated that it would be best if I did not work with this particular client and clients in other parts of the region where my friend from Gartner was working (specifically Nevada and Utah).  I wanted to be sure to comply with the terms of the

non-solicitation portion of my employment agreement with Gartner and to avoid a personal conflict.  My supervisor agreed.

47.     I then contacted the relationship person at Gartner who I knew to be associated with this particular individual and the state agency he worked for.  We ultimately communicated via messaging.  I was being straightforward and candid and was not trying to hide anything from him or from Gartner.  My objective was to ensure complete transparency and that there was no intended malice on my part.

48.     In its papers, Gartner claims I retained confidential or proprietary information.  This also is incorrect.  When I was preparing to depart Gartner, and at Gartner's instruction, I deleted scores of documents that were in my possession, some of which contained client confidential information or that might have contained, in my view, information that Gartner would use to differentiate its offerings (whether or not they could be considered confidential).  I wanted to be as thorough as possible in complying with Gartner's instructions to eliminate all client confidential information.  Some were on my personal drive and some were on Gartner's system.

49.     Gartner's allegations against me make it seem like I am and was trying to sabotage Gartner.  This is wrong.  In fact, after giving my notice, I was focused on leaving my research colleagues in the best possible position upon my departure to ensure their continued success and to try to make sure that I shared knowledge that might be helpful to them.  I worked very hard during this period to accomplish that.

50.    In the weeks during my notice period at Gartner, I worked with Bill Finnerty to make this happen.  In fact, it was I who suggested the method of improving knowledge retention at Gartner.  Typically, Gartner analysts would simply leave documents in an archive on the shared drive for successors to parse through, determine relevance, and eventually delete.  I had been frustrated by this myself when colleagues left Gartner.  This was not an efficient or valuable transfer of information, and a lot of data was lost to the archives when individuals resigned.  I was committed to ensuring the data was not lost to Gartner and my teammates and remained accessible to them.  I ensured that the resources and information I had collected across my areas of topic coverage were centralized, clearly indexed, current and easily-referenced and leveraged by any one on the research team.  For example, the shared drive included all of the key slide compilations in PowerPoint that I used as visual references during inquiries, the matrices of vendor and product information I developed and maintained during my tenure, examples of written responses for each of the topics I covered, and any other current and relevant funding and legislative information and resources that would support responding to client inquiries.  I also cleaned up and eliminated drafts and old versions from the main repository, though they were archived in case anyone wanted to review them.  This was not required by Gartner but it was important to me to improve this process.

51.    Also during my notice period, I built a directory of comprehensive notes accessible by the team via OneNote and created a knowledge management system to ensure there was a central repository for notes to be taken and stored.  This included information about specific products and vendors I had been briefed about during my time as an analyst.  Before this, there was no standard or centralized data collection process for these briefings.  So when a

Gartner analyst departed, those notes were just lost.  Building this system was not required by Gartner but it was important to me to improve the retention of notes.

52.     As an analyst at Gartner, I wrote many research pieces from publicly available information.  During my employment, I stored copies of the articles I authored on a personal drive as it is representative of my personal portfolio.  I have not shared these documents with anyone.  They were addressed along with other non-confidential documents in my counsel's letter of May 30, 2023.  *See* Exhibit A.  On June 1, counsel for Gartner requested that the documents be delivered to Gartner.  My counsel did that within a few business hours, and a copy of that exchange is attached as **Exhibit D**.  Gartner has also requested a certification from me which I provided on June 5, 2023, and a copy is attached as **Exhibit E**.

53.     With respect to the document that I worked on, "Gartner 2023 Top Technology Trends for Government," (Complaint ¶ 81), I did email that to myself to maintain as part of my personal portfolio.  I deleted it in compliance with Gartner's separation instructions while I was employed by Gartner.  I never gave this article, or any of its content, to anyone at Info-Tech.  I do believe, however, it was distributed externally by others at Gartner and was certainly made available to Gartner clients.

54.     I did send one document to three Info-Tech personnel in early May that I compiled while I worked at Gartner.  It is an Excel document which did not contain any confidential information.  It is an incomplete list of applications used in states for ERP, tax, and other systems that I gathered from public sources.  It was not an assigned project, work for a client, or published to Gartner's site.  I gave this document to Gartner while I was transitioning

out for the central repository of documents I created during the departure process.  Gartner has been notified of this as well.  *See* Exhibit A.

**I am a Resident of**
**California**

55.     I understand that Gartner may take the position that I am not a resident of California.  That is not correct—I am a resident of California.  Gartner has alleged that I am currently a resident of Arizona, despite having been told by Info-Tech's counsel that I am a resident of California a day or two before the complaint was filed.

56.     When I started working for Gartner in 2007, I was a resident of Citrus Heights, California.  I remained in California at various addresses through November 2020.  In fact, when I started as a Senior Director, Analyst in 2016, I lived in California.

57.     In November 2020, and with Gartner's approval, I moved to Phoenix, Arizona with my family.  The move to Arizona was a personal move that was prompted in part due to Covid.  In addition, the move allowed me to bring my father into my home for care until his death in June 2021.

58.     In December 2022, I requested permission at Gartner to move back to California.  I talked to my manager, Ms. Fabular, who is based in California, and then submitted a follow-up request in writing.  Ms. Fabular approved my request to move with Gartner's human resources department.  I also discussed my relocation to California with Gartner Vice President Mr. di Maio and other research team colleagues.  This was also a personal move to not only

assist my mother but also to resettle my family in California to support my youngest daughter who had not adjusted well in Arizona.

59.     As of January 1, 2023, I submitted my new address, 202 E Cypress Avenue, Lompoc, California 93436, to Gartner's online system, Workday HR.  Once my California address was processed in Gartner's system, I submitted an updated W-4 to reflect the California address.  It is my understanding the move from Arizona to California resulted in changes to my federal and state tax withholdings during my employment with Gartner.  I believe Gartner's human resources records would reflect this.  I did receive human resources-related mail at this address, including benefits information.

60.     On February 10, 2023, I obtained my California driver's license.

61.     The Gartner research team was aware that I would be traveling between California and Arizona in early 2023, as my daughter was finishing the school year in Phoenix.  Once the school year ended, my husband would begin the process of selling our home in Arizona and the rest of my family would then move to California.  Since this case was filed, we have temporarily suspended the house search because of the uncertainty it has brought.

62.     I ended up spending more time in Arizona than I planned in early 2023 for a few reasons.  First, I had several scheduled medical procedures in Arizona which required me to attend appointments and then allow for a few days of recovery before I could travel.  At times, I needed assistance during recovery with basic daily living activities.  Second, I did not have a stable internet connection in Lompoc.  Given my job duties and remote work, reliable connectivity was essential so I could participate in client discussions, some on very short notice.

63.     Gartner has acknowledged my California residence.  It recently sent mail to me in California related to my separation from employment.  These documents were related to COBRA benefit options and to the continued access to my Health Savings Account funds, which I understand to be required legal communications.

64.     At Info-Tech, I completed several employment and payroll forms.  The USCIS Form I-9 regarding Employment Eligibility Verification for the Department of Homeland Security lists my Lompoc, California address as my address.  In addition, my payroll and withholding documents list Lompoc, California as my address.  I am subject to California state taxes, which I most certainly would not voluntarily subject myself to if, as Gartner has suggested, I am not truly a resident of California.

65.     I currently reside in Blythe, California at 500 Riviera Drive, Spc. A4.  That location allows me to easily get to Phoenix, where my family still resides.  Blythe is also a good location for me to complete my current medical care plan.  I intend to return to Lompoc, California when my medical situation stabilizes.  My husband and I were exploring more permanent housing as part of our plan until this matter arose and Gartner accused me of wrongdoing.

66.     I do not live in Connecticut and never have.  I do not own property in Connecticut.  I do not have a bank account in Connecticut.  I do not pay Connecticut state taxes.

67.     Last, my family cannot sustain disruption to my income while this dispute is resolved.  I earn about double what my husband earns.  Disruption to my income would substantially inhibit our ability to care for and support for our children, not only for the short term, but also long term.  We need to invest in programs and supports to assist them to become self-reliant, and to plan for their financial needs beyond our lifetimes.  This is essential, for the reasons set forth in my separate declaration.

Dated:        June 5, 2023

_____
Alia Mendonsa

- 24 -